# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 13-2406

PRESTON LEE DENT, APPELLANT,

V.

ROBERT A. MCDONALD,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided July 15, 2015)

*Glenn R. Bergmann,* of Bethesda, Maryland, was on the brief for the appellant.

*Will A. Gunn*, General Counsel; *Mary Ann Flynn*, Assistant General Counsel; *Michael A. Carr*, Deputy Assistant General Counsel; and *Catherine A. Hulgan*, Appellate Attorney, all of Washington, D.C., were on the brief for the appellee.

Before MOORMAN, PIETSCH, and BARTLEY, *Judges*.

MOORMAN, *Judge*, filed the opinion of the Court.  BARTLEY, *Judge*, filed a separate opinion concurring in part and dissenting in part.

MOORMAN, *Judge*: Veteran Preston Lee Dent appeals through counsel an April 30, 2013, Board of Veterans' Appeals (Board) decision concluding that a debt for overpayment of non-service-connected pension benefits was properly created.  Record (R.) at 3-10.[1]  This appeal is timely and the Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. § 7252(a).  This case was submitted to a panel to address the applicable statutory provisions of 38 U.S.C. § 5112(b), prescribing the effective dates VA is to apply to reduction and discontinuance of monetary benefits.

---

[1] The Board referred to the agency of original jurisdiction (AOJ) the issue of entitlement to waiver of recovery of that overpayment.  R. at 4-5.  The Court has jurisdiction to review referred issues only to the extent that the appellant argues that remand, rather than referral, was appropriate.  *See Young v. Shinseki*, 25 Vet.App. 201, 202-03 (2012) (en banc order); *Link v. West*, 12 Vet.App. 39, 47 (1998) ("Claims that have been referred by the Board to the [regional office] are not ripe for review by the Court.").  Mr. Dent has not challenged the propriety of the Board's referral.  The Secretary informs the Court that the Milwaukee Pension Management Center subsequently denied the waiver request in a June 16, 2014, decision.  Dec. 18, 2014, Secretary's Response.  The Court will not address the Board's referral of the waiver issue.  *See Pederson v. McDonald*, 27 Vet. App. 276 (2015) (en banc) (holding that the Court has discretion not to consider an issue abandoned on appeal).

In so doing, we hold that (1) "award" in 38 U.S.C. § 5112(b)(9) and (10) includes "payments of awards," such as the payment of a running award of pension as in this case;[2] and (2) the "beneficiary's knowledge," 38 U.S.C. § 5112(b)(9), and "administrative error or error in judgment," 38 U.S.C. § 5112(b)(10), are factors to be considered in determining the validity of a debt where, subsequent to the initial award of VA pension benefits, a beneficiary experiences a "change in income," 38 U.S.C. § 5112(b)(4)(A).  Accordingly, the Court holds that, in determining whether an erroneous payment resulted in a valid debt in circumstances involving a running award, VA must consider, when the issue is raised, whether the continued payment of the running award was based on VA "administrative error or error in judgment."  The Court further holds that the Board did not err in finding that the continued payment of the pension award in this case was not based "solely on administrative error or error of judgment" and that Mr. Dent had knowledge of the erroneous continued payments.  Accordingly, the Court will affirm the portion of the April 30, 2013, Board decision finding that the overpayment debt against Mr. Dent was validly created.  The Court will remand the matter of the proper amount of that debt, in addition to the assignment of an appropriate effective date for the reduction and discontinuance of the pension award, with the instruction that the Board further remand that issue to the appropriate VA regional office (RO) for issuance of a Statement of the Case (SOC).

## I.  FACTS

Mr. Dent served on active duty in the U.S. Navy from September 1974 to July 1977. R. at 359, 380.  On February 12, 2008, Mr. Dent submitted a VA application for compensation and pension.  R. at 341-54.  As part of the application he was required to complete Part D.  Part D, Section V, instructed Mr. Dent to give VA specific information about the income he received and the income he expected to receive from all sources and then referred him to tables on the next page,

---

[2] By way of background, "improved pension" refers to the pension program subsequent to December 31, 1978, under Public Law 95-588, 92 Stat. 2508 ("Veterans' and Survivors' Pension Improvement Act of 1978"); "section 306 pension" refers to the program available on or after July 1, 1960, and through December 31, 1978, that arose out of Public Law 86-211, 73 Stat. 432 (The "Veterans' Pension Act of 1959"); and "old-law pension" refers to the program available before July 1, 1960.  *See generally* 69 Fed. Reg. 77578, 77580 (Dec. 27, 2004) (Proposed rule) (summarizing background of prior pension programs).  As discussed below, certain annual income is countable income for purposes of determining eligibility for pension and the monthly rate of pension.

which included "[s]ources of recurring monthly income," including "Social Security" and "Supplemental Security (SSI)/Public Assistance," and corresponding blocks for him to record any such income. R. at 353-54. Mr. Dent indicated that, at that time, he was not receiving any recurring monthly income. R. at 354. Section V also explained: "If you are receiving monthly benefits, give us a copy of your most recent award letter. This will help us determine the amount of benefits you should be paid." R. at 353. Part D, Section V, further instructed Mr. Dent that "[p]ayments from any source will be counted, unless the law says that they don't need to be counted," and that "VA will determine any amount that does not count." *Id*.

In November 2008, the RO, inter alia, awarded Mr. Dent non-service-connected pension benefits in the monthly amount of $931, effective February 12, 2008, the date of his claim. R. at 148-58. The cover letter stated: "We awarded your benefit because you have no income from February 12, 2008." R. at 148-49. The letter also explained that Mr. Dent was "responsible to tell [VA] right away if . . . [his] income or the income of [his] dependents changes (e.g., earnings, *Social Security benefits*, lottery and gambling winnings)." R. at 150 (emphasis added).

The cover letter also noted: "We enclosed a VA Form 21-8768, 'Disability Pension Award Attachment' which explains important factors concerning your benefits," and the end of the letter referred again to the form as an enclosure (R. at 149, 152), but the record does not appear to contain a copy of that form. *See* Reply Brief (Br.) at 2. That form, which the Secretary appended to his brief, sets forth several conditions that affect the right to pension payments, the first of which is a change in income. Secretary's Br. at A-3 [hereinafter VA Form 21-8768]. With respect to that condition, the form states:

> Your rate of pension depends upon the amount of family income and the number of dependents. Your benefits may be affected by any changes in the amount of family income and marital or dependency status of you or your dependents.
>
> > a. Change in family income and net worth: You are required to report the total amounts and sources of all income and net worth for you and your dependents for whom you have been awarded benefits.

*Id*. At the bottom of the form, under the heading "**IMPORTANT,**" is the following instruction: "Notify us immediately if there is a change in any condition affecting your right to continued

payments. Failure to notify us of these changes immediately will result in an overpayment which is subject to recovery." *Id*.

In January 2009, Mr. Dent sent the RO a copy of a December 2008 Social Security Administration (SSA) decision awarding Supplemental Security Income (SSI)[3] from July 1, 2007, to November 30, 2008, (R. at 117-32) and informing him that SSA would "be in touch . . . about [SSI] back payments." (R. at 118). Although not entirely clear from the letter, it appears that SSA concluded that, beginning December 1, 2008, Mr. Dent's income would exceed the threshold for SSI payments because of his receipt of other monthly Social Security disability benefits. *See* R. at 118 (referencing a "one-time payment of Social Security benefits . . . received December 2008 of $877.00" and other monthly "Social Security benefits . . . of $927.00 for January 2009"), 131 (SSA's calculation that he was not eligible to receive SSI for December 2008 because his $877 Social Security benefit for that month (with adjustments) exceeded the monthly $637 SSI rate), 132 (SSA's calculation that he was not eligible to receive SSI from "January 2009 on" because his $927 monthly Social Security benefit as of that date (with adjustments) exceeded the $674 SSI rate.

In January 2009, Mr. Dent sent the RO a copy of the SSA award letter, his VA pension check dated December 31, 2008, which he voided, and a letter explaining why he was returning that check. R. at 133-37. That letter stated:

> I was instructed by the local VA office to send you this. As I understand it[,] I am only to receive the difference between the VA disability and my SSDI [(Social Security Disability Insurance)].[4] (I do not know how much of my SS[A] check is SSI and how much is SSDI.)
>
> I believe though that I am only to receive from you [$]985 - [$]927 = $58.00 from your office. Please correct me if I am wrong. (I did not cash the check you sent me for Jan[uary] because I also received an SS[A] check.) I am writing VOID on the check I am returning.

---

[3] SSI is a need-based income supplement program funded by general tax revenues (not Social Security taxes) designed to help aged, blind, and disabled people who have little or no income afford basic necessities such as food, clothing, and shelter. "Supplemental Security Income," SSA, http://www.ssa.gov/ssi/ (last visited July 13, 2015).

[4] SSDI is an insurance-like program that pays a disabled person benefits from Social Security taxes. "Benefits for People with Disabilities," SSA, http://www.ssa.gov/disability/ (last visited July 13, 2015).

4

R. at 136-37.[5]  VA did not respond to that letter until September 2009, and Mr. Dent continued to receive and cash VA pension checks at the full, unadjusted rate following his return of the December 2008 VA check.  *See* R. at 16, 77-78.

Five months later, in June 2009, the RO alerted the Milwaukee office of the VA Pension Management Center (PMC)[6] that, according to an SSA "share screen," Mr. Dent had been awarded SSI retroactive to December 2007, that he "switched" from SSI to another Social Security disability benefit in December 2008, and that he was subsequently paid a lump-sum amount of $24,484.11 in retroactive Social Security disability benefits.  R. at 104.  The RO indicated that Mr. Dent had been receiving non-service-connected pension "with no income" since March 2008, deferred decisionmaking, and instructed the PMC to "take the appropriate steps in this case."  *Id.*

---

[5] "For current-law pension [(i.e., Improved Pension)] purposes, SSI income is considered to be income from welfare and is not countable."  VA ADJUDICATION PROCEDURES MANUAL REWRITE (M21-1MR), pt. V, subpt. iii, ch. 1, § B(1)(k) (SSI Program), http://www.benefits.va.gov/WARMS/M21_1MR5.asp (follow Subpart III, Chapter 1, "Section B - Social [S]ecurity Administration (SSA) Benefits Program" hyperlink; then scroll to Topic 1) (Topic 1 last revised June 15, 2015) (last visited July 13, 2015).  SSDI, however, is considered income that is countable.  *See* 38 C.F.R. § 3.262(f) (2015).

As an aside, we clarify our citation to the Agency manual, which provides instructions to the Agency's adjudicators, including procedures for, among other matters, the adjudication of claims for pension.  As this Court has recognized, the Agency's manual "is dynamic rather than static," and manual provisions are "amended, added[,] and deleted on a continual basis for any number of policy, legal[,] or administrative reasons."  *Fugere v. Derwinski*, 1 Vet.App. 103, 109 (1990).  In this regard, the Court notes that the manual was previously titled the Adjudication Procedures Manual, M21-1.  Subsequently, the Agency referred to its manual, as rewritten in part, as the M21-1MR (the "MR" designation stands for "Manual Rewrite"), and now it appears that the Agency is once again updating large portions and referring to the updated version as the "M21-1" without using the added "MR" designation despite its online location within the M21-1MR.  *See*, *e.g.*, M21-1MR, pt. V, subpt. iii, ch. 1, § B(1)(k) (SSI Program) ("Reference:  For more information on exchanging information with the SSA, see M21-1, Part III, Subpart iii, 3.B." (referencing "M21-1," but found online under "M21-1MR - Adjudication Procedures Manual Rewrite," at http://www.benefits.va.gov/WARMS/M21_1MR3.asp (follow Subpart III, Chapter 3, "Section B - SSA Requests for Information from VA" hyperlink.)).  To avoid confusion, the Court cites to the Agency manual provisions using "M21-1MR" because the Agency makes the new M21-1 provisions available on its website under that source.

[6] VA has three PMCs that serve different regions of the country: one in Philadelphia for the east coast and New England, one in Milwaukee for the central United States, and one in St. Paul for the western United States.  *See* "Pension Management Centers," VA, http://www.benefits.va.gov/PENSION/resources-contact.asp (last visited July 13, 2015).

In July 2009, the PMC accessed SSA's electronic information sharing system[7] and obtained a history of Mr. Dent's receipt of SSA payments of Retirement, Survivors, and Disability Insurance (RSDI).[8] R. at 96-97. That payment history reflects that Mr. Dent received a one-time RSDI payment of $877 on December 24, 2008; a lump-sum retroactive RSDI payment of $24,484.11[9] on April 9, 2009; and recurring monthly RSDI payments of $927 from January 2009 to July 2009. R. at 96.

In September 2009, the PMC sent Mr. Dent a letter informing him that SSA benefits were considered countable income for VA pension purposes. R. at 98-101. The PMC proposed to substantially reduce his monthly non-service-connected pension payments effective January 1, 2009–the date that he began receiving monthly RSDI payments–and to stop pension payments altogether retroactive to May 1, 2009–the date that his total income exceeded the maximum allowable amount for pension payments by virtue of the April 2009 award of retroactive RSDI payments in the amount of $24,484.11. *Id.* The PMC explained that this adjustment would result in an overpayment of benefits; that Mr. Dent would subsequently be notified of the exact amount of the overpayment and be given information regarding repayment; and that, if he continued to accept pension payments at the current rate, he would have to repay all or part of those payments. R. at 98, 100. The PMC also informed him that he had 60 days to submit evidence and argument to dispute the proposed reduction and discontinuance of his pension benefits and that, if he failed to do so, the proposed adjustment would take effect. R. at 99-100. The PMC did not, however, acknowledge that Mr. Dent in January 2009 had informed the RO of an award of Social Security benefits or that the RO in June 2009 had accessed information directly from SSA regarding his benefits.

---

[7] SSA maintains a real-time data sharing system, the Federal Online Query (FOLQ) system, that allows federal agencies to electronically access and obtain information regarding an individual's SSA benefits payments. *See* M21-1MR, pt. III, subpt. iii, ch. 3, § A(3)(a)-(c), http://www.benefits.va.gov/WARMS/M21_1MR3.asp (follow Subpart III, Chapter 3, "Section A - Department of Veterans Affairs (VA) Requests for Information from the SSA" hyperlink; then scroll to Topic 3) (Topic 3 last revised June 17, 2014) (describing FOLQ) (last visited July 13, 2015).

[8] RSDI includes all SSA *insurance* benefits and therefore does not include SSI. *See* "Reducing Improper Payments," SSA, http://www.ssa.gov/improperpayments/recoveryEfforts.html (last visited July 13, 2015).

[9] Although the calculation is somewhat unclear, it appears that this is the net amount of retroactive RSDI paid to Mr. Dent after $2,411.75 in attorney fees and an SSI windfall offset of $4,705.34.

Mr. Dent did not timely respond to the September 2009 PMC letter, and, in November 2009, the PMC contacted SSA to verify the amount of Social Security disability benefits–i.e., RSDI and SSI–that had been paid. R. at 90. The RSDI calculation was the same as the one received in July 2009 (R. at 96), except that the new calculation showed recurrent monthly RSDI payments through December 2009 (R. at 93). The SSI calculation came to $8,201.11, which included a $7,951.11 lump-sum retroactive payment in December 2008 and an unexplained one-time payment of $250 in May 2009. R. at 94-95.

In December 2009, the PMC implemented the reduction and discontinuance of VA pension benefits proposed in September 2009. R. at 82-87. Specifically, the PMC notified Mr. Dent that his monthly pension payments would be retroactively adjusted from $985 per month to $108 for January 2009, to $58 per month from February 2009 to April 2009, and to $0 thereafter. R. at 82-83. The PMC also informed him that, as a result of this adjustment, he had "been paid too much" and would be contacted shortly regarding the amount of the debt and how to repay it. R. at 83.

The next month, Mr. Dent sent the PMC a letter disputing those reductions and the resultant debt. R. at 626. He stated that, in January 2009, he had voided and returned his December 2008 pension check and had contacted the RO to clarify whether he might receive concurrent payments from VA and SSA, but did not receive a response. *Id.* He explained: "When I received another $985 check for January 2009, I figured I had been given the wrong information and that I was to receive both checks. . . . In retrospect[,] I did alert you when I received a check I did not think I was supposed to get. Your offices kept sending them." *Id.*

Later in January 2010, the PMC sent the veteran a letter notifying him that he had been overpaid $11,538 and needed to repay that debt. R. at 627. That letter indicated that VA Form 0748, "Notice of [Debtor] Rights and Obligations," was enclosed in the mailing (*id.*), but the record also does not appear to contain a copy of that form. That form, which the Secretary appended to his brief, states that the debtor has the right to dispute the existence or the amount of the debt or request a waiver of the debt. Secretary's Br. at A-5.

In February 2010, Mr. Dent submitted a statement expressing disagreement with that debt. R. at 77-81. He recounted actions he took in January 2009 and his belief at that time that VA was

7

only supposed to pay him the difference between his regular pension rate and the rate of his monthly Social Security disability benefits. R. at 77. He explained:

> My first check came at the end of December of 2008. From the rumors I had heard I was only supposed to receive the difference between my SS disability and the VA check. Therefore I voided out the December check and returned it along with a letter explaining what I just said. The next month (the end of Jan[uary] 2009)[,] I received another check. I figured the rumors I heard were wrong. The checks kept coming. I then received a letter dated 1 September 2009. I responded to that letter. I[t] wasn't until December of 2009 that I received any more letters. At that time my checks stop[p]ed.

R. at 77-78. He also stated that VA first alerted him of the payment error in September 2009 and asserted that he "should only have to pay back the money paid [] after. . . September." R. at 77.

In September 2010, the RO issued an SOC determining that the overpayment debt was validly created. R. at 47-69 (including reference to 38 C.F.R. § 3.660 as a pertinent regulation). The RO acknowledged Mr. Dent's January 2009 letter and stated that, "[u]nfortunately the [PMC] did not process this information immediately, but instead processed it beginning on September 1, 2009, when the proposal letter was sent to you." R. at 69. Nevertheless, the RO concluded that he was indebted to VA because "income from [SSA] is countable income." *Id*.

> The next month, Mr. Dent submitted a Substantive Appeal, which stated, in pertinent part:

> Based on my current finances, I cannot repay the VA pension that I received. I called the VA when I was awarded my Social Security [benefits and] was told that I could keep both. I also called back [and] was told that I [may] keep the difference meaning if SS is greater than [] VA, then nothing [and] if the VA is less than SS, the[n] the VA would pay me the difference. Example: My SS = $927.00 + VA = 985.00 . . . . I called the []RO again [and] was convinced by the Call Center in St. Louis that I could keep both [and] for me to disregard everything else. Repaying the money back to the VA would be a hardship on me. Both benefits were granted the same month [and] I didn't want to do wrong, but the VA counselor told me it was ok.

R. at 43-44.

In August 2011, Mr. Dent attended a Travel Board hearing and testified that, when he began receiving SSA benefits, he asked representatives at a veterans service organization (Veterans of Foreign Wars (VFW) in Belleville, Illinois) whether he may receive payment from VA and SSA at the same time and got "three different answers." R. at 14-15. Mr. Dent stated that the answer that

8

"sounded most logical" was that he was only entitled to VA pension in the amount that exceeded his SSA benefits, prompting him to void the December 2008 VA pension check and return it to the RO for "adjustment." R. at 15-16. Mr. Dent explained that, when the RO did not make an adjustment and instead continued to pay him at his regular pension rate, he assumed that he was entitled to full payment from both agencies. R. at 16. He also testified that he never received the check back from VA after he voided it and returned it to VA. R. at 19.

In April 2013, the Board issued the decision currently on appeal, which found that a debt for overpayment of non-service-connected pension benefits was properly created. R. at 3-10. The Board focused solely on the validity of the debt because it explicitly found that it did not have jurisdiction at that time to address entitlement to waiver of the debt. R. at 4-5. The Board further acknowledged that the "exact amount of the overpayment" was not contained in the claims file. R. at 4. This appeal followed.

## II. ANALYSIS

### A. The Parties' Arguments

Mr. Dent argues that the Board erred in finding that the debt created by VA's overpayment of non-service-connected pension benefits was valid because "[a]ll payments from January 2009 through September 2009 were the result of VA's administrative error." Appellant's Br. at 6. Specifically, he contends that (1) when he was initially granted pension, VA failed to notify him of the effect a subsequent award of SSA benefits would have on the amount of pension he was entitled to receive; and (2) in light of his actions in January 2009 to alert VA of a possible overpayment and VA's failure to address the situation for nine months thereafter, he should be given the benefit of the doubt and all fault should be ascribed to VA. *Id*. at 7-9. In the alternative, Mr. Dent argues that the debt was valid only from April 9, 2009–the date that he received the lump sum payment of retroactive RSDI benefits–because, prior to that date, there is no evidence that he "should have known" that he was not entitled to his pension benefits. *Id*. at 9-10.

The Secretary responds that an assessment of whether an overpayment was based solely on administrative error applies only in the *initial* award of non-service-connected pension benefits or in the *initial* pension rate. Secretary's Br. at 12-15. The Secretary contends that because the

9

appellant had a "change in income," the effective-date provisions in 38 U.S.C. § 5112(b)(4)(A) and 38 C.F.R. § 3.500(c) and § 3.660 apply, and the effective-date provision in section 5112(b)(10) based on VA administrative error does not apply. *Id*. Citing 38 C.F.R. § 3.660(a)(3), the Secretary asserts that because the appellant does not dispute his change in income due to SSA benefits, "by law, the overpayment created by the retroactive reduction and discontinuance of pension benefits is valid and 'subject to recovery' absent waiver." *Id*. at 15.

In the alternative, the Secretary argues that, assuming sections 5112(b)(9) and (10) are applicable to the circumstances here and administrative error is assessed, the appellant has not shown that the overpayment resulted solely from VA administrative error. *Id*. at 16-21. In this regard, the Secretary contends that the Board's finding that the overpayment was not solely caused by VA administrative error was not clearly erroneous because the record demonstrates that the appellant had knowledge of his duty to report a change in his income and, in his January 2009 letter to VA with his voided December 2008 pension check, expressed an understanding of the rules governing non-service-connected pension payments and, further, he had actual or constructive knowledge of the consequences of failing to do so. *Id*.

In his reply brief, Mr. Dent asserts that, given his January 2009 letter, it was "VA's own administrative delay in addressing new information that created a debt in this case, not [his] failure to disclose material facts." Reply Br. at 2. He also points out that the Secretary did not respond to his alternative argument about the debt being valid only from April 9, 2009, and contends that, at a minimum, the Court should deem that argument conceded and reverse the finding with respect to that argument. *Id*. at 3 (citing *MacWhorter v. Derwinski*, 2 Vet.App. 133, 136 (1992)).

### B. Applicable Law

Pursuant to 38 U.S.C. § 1521(a), the Secretary "shall pay to each veteran of a period of war who meets the service requirements of this section . . . and who is permanently and totally disabled from non-service-connected disability not the result of the veteran's willful misconduct, pension at the rate prescribed by [statute]." The maximum annual rates for improved pension must be reduced by the amount of the veteran's countable annual income. *See* 38 U.S.C. § 1521; 38 C.F.R. § 3.23(b) (2015); *see also Springer v. West*, 11 Vet.App. 38, 40 (1998). "Payments of any kind from any source shall be counted as income during the 12-month annualization period in which received

10

unless specifically excluded under § 3.272." 38 C.F.R. § 3.271(a) (2015); *see also* 38 U.S.C. § 1503; *Martin v. Brown*, 7 Vet.App. 196, 199 (1994) ("[S]tatute and VA regulations provide that 'annual income', as defined by statute and applicable regulation, includes payments of any kind from any source, unless explicitly exempted by statute or regulation."); 38 C.F.R. § 3.262(f) (2015) (providing for the inclusion of certain Social Security benefits as countable income); 38 C.F.R. § 3.272 (2015) (enumerating categories to "be excluded from countable income for the purpose of determining entitlement to improved pension"). "Whenever there is a change in a beneficiary's amount of countable income[,] the monthly rate of pension payable shall be computed by reducing the beneficiary's applicable maximum annual pension rate by the beneficiary's new amount of countable income on the effective date of the change in the amount of income." 38 C.F.R. § 3.273(b)(2) (2015). VA regulation describes the "monthly rate of pension" that is payable as a "running award." 38 C.F.R. §§ 3.273(b)(1), (b)(2).

The relevant authority for determining the effective dates of reductions and discontinuances of pension is 38 U.S.C. § 5112 (formerly section 3012). This section provides in pertinent part:

> (a) Except as otherwise specified in this section, the effective date of reduction or discontinuance of . . . pension shall be fixed in accordance with the facts found.

> (b) The effective date of a reduction or discontinuance of . . . pension–
> . . . .

> (4) by reason of–
> (A) change in income shall (except as provided in section 5312 of this title [("Annual adjustment of certain benefit rates")]) be the last day of the month in which the change occurred; . . .

> . . . .

> (9) by reason of an erroneous award based on an act of commission or omission by the beneficiary, or with the beneficiary's knowledge, shall be the effective date of the award; and

> (10) by reason of an erroneous award based solely on administrative error or error in judgment shall be the date of the last payment.

38 U.S.C. § 5112(b)(4), (9)-(10).

Based on the provisions above, under 38 U.S.C. § 5112(b)(4)(A), when reduction or discontinuance of a pension award is required because of an increase in income, the reduction or discontinuance is required to be made effective *at the end of the month in which the increase occurred*. Under 38 U.S.C. § 5112(b)(9), however, when reduction or discontinuance of a pension award is required because the "award" was erroneous based on an act of commission or omission by the beneficiary, or with the beneficiary's knowledge, the reduction or discontinuance *shall be the effective date of the award*. Further, under 38 U.S.C. § 5112(b)(10), when reduction or discontinuance of a pension award is required because the "award" was erroneous based on administrative error or error in judgment, the reduction or discontinuance is required to be made effective *on the date of last payment*.

It is undisputed that the appellant had a "change in income." The parties dispute, however, whether sections 5112(b)(9) and (10) are for consideration in circumstances where, *subsequent* to the initial award of pension, there has been a "change in income" and an assertion that VA made an "erroneous" payment of the "award." The answer to this question depends on whether "award" in sections 5112(b)(9) and (10) refers to a running award (i.e., recurring payments made subsequent to an initial award) or is limited, as the Secretary suggests, to the initial award of pension. The dispute, therefore, lies in the meaning of "award."

### 1. Statutory Interpretation

Statutory interpretation "starts with the words of a statute, which must be interpreted in the context of the Act as a whole," and "[w]here ambiguity persists after application of the standard tools of statutory construction, legislative history may be used to resolve any such ambiguity." *Frederick v. Shinseki*, 684 F.3d 1263, 1269 (Fed. Cir. 2012). Specifically, we must apply the two-step *Chevron* analysis. First, we must determine "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter." *Id.* at 842-43. However, if "Congress has not directly addressed the precise question at issue," we must, second, determine whether VA's regulation is "based on a permissible construction of the statute." *Id.* at 843.

"[I]n a *Chevron* step-one analysis, we employ traditional tools of statutory construction and examine 'the statute's text, structure, and legislative history, and apply the relevant canons of

interpretation.'" *Heino v. Shinseki*, 683 F.3d 1372, 1377-78 (Fed. Cir. 2012). Beginning with the statute's text, a term as general as the word "award" in section 5112 does not have a single plain meaning. *See* BLACK'S LAW DICTIONARY 950 (9th ed. 2009) [hereinafter BLACK'S] (defining "award" as "[t]he decision or determination rendered by arbitrators or commissioners, or other private or extrajudicial deciders, upon a controversy submitted to them; also the writing or document embodying such decision."). Title 38, U.S. Code, does not define the word universally to cover all sections contained within the title, and section 5112 does not define it for purposes of that section. As illustrated by section 5111(d), which defines "award" for the purpose of that section only, the definition of "award" may refer to different types of awards, such as "an original or reopened award" or "an increased award." 38 U.S.C. § 5111(d); *see also, e.g.*, 38 U.S.C. § 1117 (h)(2)(A) (specifying "the *original* award of compensation or service connection" (emphasis added)). Thus, the plain meaning of the term "award" in sections 5112(b)(9) and (10) is ambiguous and does not, standing alone, reveal congressional intent. *See Heino*, 683 F.3d at 1378 (holding that the plain meaning of the term "the cost" referred to in section 1722A(a)(2) of title 38, U.S. Code, was ambiguous); *see also Fountain v. Shinseki*, 27 Vet.App. 258, 268 (2015) (holding that the phrase "[o]rganic diseases of the nervous system," contained in 38 U.S.C. § 1101(3) was ambiguous because the statute did not define the phrase).

The legislative history of Public Law 87-825, which amended section 3012 (now section 5112) by adding the three subsections at issue here, (b)(4), (b)(9), and (b)(10), however, clarifies the purpose of their addition and, as to subsections (b)(9) and (b)(10), specifically clarifies the meaning of the word "award." Pub. L. No. 87-825, § 2, 76 Stat. 948, 949 (1962). When Congress passed amended section 3012 in 1962, the explanatory statement of H.R. 7600 stated in relevant part:

> (4) The effective date of a reduction or discontinuance by reason of a change in income or corpus of estate will be the last day of the month in which the change occurred. This eliminates the need for setting up overpayments of benefits in those cases in which, for a part of the year, the rate of income does not exceed the annual statutory limits and net assets do not bar payment . . . . It is also our interpretation of this provision that it is not intended to breach the longstanding principle of the annual income limitation in the pension program.
>
>     . . . .

(9) The effective date of a reduction or discontinuance of an erroneous award based upon an act of commission or omission by the beneficiary shall be effective the date of the erroneous award. This is a restatement of existing law as it relates to fraud and is broadened to include other acts or failure to act on the part of the claimant, not necessarily fraudulent in nature, which constitute misrepresentation or other furnishing of incorrect information or failure to furnish correct information, *leading to the establishment or continuation of an award of payments* which should not have been made. All overpayments created under this provisions would be subject to recovery unless waived upon consideration of fault under 38 U.S.C. [§] 3102.

(10) The effective date of a reduction or discontinuance solely because of administrative error or error in judgment would be the date of last payment. Existing law is silent in this regard. The provision with certain exceptions, follows current administrative practices. It is to be distinguished from the preceding provision in that it may not be applied in any case where *the erroneous payment* results from an act of commission or omission by the beneficiary. It is intended to include cases in which *an erroneous action* was predicated on a misunderstanding of existing instructions or regulations or the applicable construction of statute. Thus, while no overpayment would be created requiring recovery, there would be no perpetuation of *the erroneous action*. It is expected that there will be documentation and assignment of error on each application of this provision.

S. REP. NO. 2042, 87th CONG., 2d SESS. (Sept. 13, 1962), *reprinted in* 1962 U.S.C.C.A.N. 3260, 3266-67, Explanatory Statement of H.R. 7600 (emphasis added); *see* H.R. REP. NO. 2123 (Aug. 2, 1962) (same) (not reprinted in U.S.C.C.A.N.).

Based on the above, we conclude that Congress intended that the latter two provisions apply to "the establishment or continuation of an award of payments which should not have been made" (section 3012(b)(9)) and to "an erroneous action" (section 3012(b)(10)). Accordingly, congressional intent garnered from those two provisions is that "award" includes not only the establishment of an award but also award *payments* made subsequent to the initial grant of the award. In addition, there is nothing in the history of subsection (b)(4) of section 5112 that indicates an intent to carry a contrary definition of the term "award" or that precludes application of subsection (b)(9) or (b)(10) to running award payments made subsequent to a change in the beneficiary's income.

In addition to the term used in the relevant subsections of section 5112, the Court looks to the overall structure of section 5112 for guidance in determining the plain meaning of the statute. "'[E]ach part or section [of a statute] should be construed in connection with every other part or

section so as to produce a harmonious whole.'" *Meeks v. West*, 12 Vet.App. 352, 354 (1999) (quoting 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 46.05 (5th ed.1992)). In this regard, section 5112(b)(4)–as well as section 5112(b)(5), which contains the term "award"–is compatible with reading the term "award" as including "payments of the award." If there is a change in income and an erroneous payment of a pension award by VA based solely on administrative error, the effective date described in section 5112(b)(10) will apply. If, however, the erroneous payment of the award is not based solely on VA administrative error, the effective date described in either section 5112(b)(4) or (b)(9) will apply.

Thus, after employing traditional tools of statutory construction, we hold that Congress has directly spoken to the precise question of the meaning of "award" and conclude that the term "erroneous award" as used in section 5112(b)(9) and (10) includes erroneous payments made subsequent to the initial award. Accordingly, when erroneous payments of a pension award are made solely as a result of VA administrative error or error in judgment under section 5112(b)(10), no debt or overpayment is created because the reduction or discontinuance is required to be made effective on the date of the last payment. 38 U.S.C. § 5112(b)(10); *see* 38 C.F.R. § 1.962 (2015) (defining "overpayment," for purposes of waiver and collection, as referring "only to those benefit payments made to a designated living payee or beneficiary in excess of the amount due or to which such payee or beneficiary is entitled"). When the erroneous payments are not solely the result of VA error, a debt or overpayment is created because the reduction or discontinuance is required to be made effective either the last day of the month in which the increase in income occurred (38 U.S.C. § 5112(b)(4)) or the date of the erroneous award (38 U.S.C. § 5112(b)(9)), not the date that VA made the last payment to the beneficiary (38 U.S.C. § 5112(b)(10)).

### 2. Regulatory Interpretation

Even if we were to find the language of the statute ambiguous, we hold, as discussed below, the Secretary's implementing regulation is consistent with congressional intent as noted above. Where the statute itself is ambiguous, we defer to VA's interpretation in its implementing regulations if that interpretation is reasonable. *See Chevron*, 467 U.S. at 843-44; *Alpough v. Nicholson*, 490 F.3d 1352 (Fed. Cir. 2007).

The general regulatory provisions concerning effective dates for reductions and discontinuances are found in 38 C.F.R. § 3.500, which contains sections promulgated to implement section 5112. Specifically, VA enacted § 3.500(b)(1) and (2) to implement 38 U.S.C. § 5112(b)(9) and (10). Section 3.500 provides in pertinent part:

> The effective date of a rating which results in the reduction or discontinuance of an award will be in accordance with the facts found except as provided in § 3.105. The effective date of reduction or discontinuance of an award of pension . . . for a payee . . . *will be the earliest of the dates stated in these paragraphs unless otherwise provided*. Where an award is reduced, the reduced rate will be effective the day following the date of discontinuance of the greater benefit.
>
> (a) *Except as otherwise provided (38 U.S.C. § 5112(a))*. In accordance with the facts found.
> (b) *Error; payee's or administrative (38 U.S.C. § 5112(b), (9), (10))*. (1) Effective date of award or day preceding act, whichever is later, but not prior to the date entitlement ceased, on an erroneous award based on an act of commission or omission by a payee or with the payee's knowledge.
> (2) Except as provided in paragraph (r) of this section, and § 3.501 (e) and (g), date of last payment on an erroneous award based solely on administrative error or error in judgment.
> (c) *Annual income.* See § 3.660.

38 C.F.R. § 3.500(a), (b)(1)-(2), (c) (2015) (emphasis in text added).

In turn, the provisions of VA regulation 38 C.F.R. § 3.660, referenced above, provide in pertinent part:

> (a) *Reduction or discontinuance*– (1) *General.* A veteran . . . who is receiving pension, . . . must notify the Department of Veterans Affairs of any material change or expected change in his or her income or other circumstances which would affect his or her entitlement to receive, or the rate of, the benefit being paid. Such notice must be furnished when the recipient acquires knowledge that he or she will begin to receive additional income . . . . In pension claims subject to § 3.252(b) [(referring to annual income limits set forth in 38 U.S.C. §§ 1521, 1541 or 1542)] or § 3.274 [("Relationship of net worth to pension entitlement")] . . . , notice must be furnished of any material increase in corpus of the estate or net worth.

(2) *Effective dates*. . . . . Where reduction or discontinuance of a running award of improved pension . . . is required because of an increase in income, the reduction or discontinuance shall be made effective the end of the month in which the increase occurred. . . . .

(3) *Overpayments.* Overpayments created by retroactive discontinuance of benefits will be subject to recovery if not waived. . . .

38 C.F.R. § 3.660 (a)(1)-(3) (2015). The authority identified under current § 3.660(a)(2) is section 5112(b).

As noted above, § 3.500(b)(2) provides that the effective date for a reduction or discontinuance is, "[e]xcept as provided in paragraph (r) of this subsection, and § 3.501(e) and (g), date of last payment on an erroneous award based solely on administrative error or error in judgment." Paragraph (r) pertains to service connection and is not applicable to the circumstances here where there is a change in a beneficiary's income that affects a pension award.[10] Sections 3.501(e) and (g) pertain to a change in employability or evaluation, respectively, and are similarly not relevant here.[11] The plain language of § 3.500(b)(2) provides that, except for what is provided for in those two provisions, when there is an erroneous award based solely on administrative error, the effective date will be the date of the last payment. *See Johnson v. McDonald*, 762 F.3d 1362, 1365-66 (Fed. Cir. 2014) (holding that "[t]he plain language of [38 C.F.R.] § 3.321(b)(1) provides

---

[10] Section 3.500(r) provides:

(r) *Service connection (38 U.S.C. § 5112(b)(6); § 3.105).* Last day of month following 60 days after notice to payee. Applies to reduced evaluation, and severance of service connection.

38 C.F.R. § 3.500(r).

[11] Section 3.501(e) and (g) provide:

(e) *Employability regained (38 U.S.C. [§] 5112(b)(5), (6); Pub. L. 87-825; §3.105)–(1) Pension.* Last day of month in which discontinuance is approved.
(2) *Compensation.* Last day of month following 60 days after notice to payee.

. . . .

(g) *Evaluation reduced (38 U.S.C. [§]5112(b)(5), (6); Pub. L. 87-825; § 3.105)– (1) Pension.* Last day of month in which reduction or discontinuance is approved.
(2) *Compensation.* Last day of month following 60 days after notice to payee.

38 C.F.R. § 3.501(e), (g) (2015).

for referral for extra-schedular consideration based on the collective impact of multiple disabilities"). Because paragraph (c), which pertains to annual income and refers to § 3.660, is not expressly excluded in § 3.500(b)(2), the provision in § 3.500(b)(2) and, therefore, § 3.500(b)(1), are for application, when raised, when there is a change in annual income. As with the authorizing statutes of subsections 5112(b)(4), (9), and (10), the regulatory provisions of § 3.500(b)(1), (2), and § 3.660 may be read harmoniously; to wit, if there is an erroneous payment of an award based solely on VA administrative error, the effective date described in § 3.500(b)(2) will apply. If, however, the erroneous payment of the award is not based solely on VA administrative error, the effective date "will be the earliest of the dates stated" under § 3.500(b)(1) or § 3.660(a)(2).

Although § 3.660(a)(3) provides that "[o]verpayments created by retroactive discontinuance of benefits will be subject to recovery if not waived," and does not specifically reference the exception afforded by § 3.500(b)(2), § 3.660(a)(3) must be read in harmony with § 3.500(b)(1) and (2) and the legislative history of statutory subsections 5112(b)(9) and (10), which reflect that an "erroneous award" includes the erroneous payment of an award. Reading the provisions harmoniously, the Court concludes that § 3.660(a)(3) is for application when § 3.660(a)(2) applies, and § 3.660(a)(2) does not apply if § 3.500(b)(2) controls because there has been a determination that the erroneous payment of a pension award was based solely on Agency error. Conversely, if there has been a determination that the erroneous payment of a pension award was *not* based solely on Agency error under § 3.500(b)(2), then § 3.500(b)(1) and § 3.660(a)(2) and (3) are not precluded from application. Accordingly, § 3.660 may be read consistent with the statute in that, although "[o]verpayments created by retroactive discontinuance of benefits will be subject to recovery if not waived," no "overpayment" is created where an award payment was made based solely on administrative error or error in judgment. 38 C.F.R. § 3.660(a)(3).

Notably, VA defines "overpayment" only in the regulation that addresses waiver, and waiver is at issue in cases where section 5112(b)(10) is not applicable. *See* 38 C.F.R. § 1.962 (defining "overpayment," for purposes of waiver and collection, as referring "only to those benefit payments made to a designated living payee or beneficiary in excess of the amount due or to which such payee or beneficiary is entitled"). Furthermore, VA manual provisions discussing the handling of cases involving administrative error state that "VA may *not* create an overpayment in a beneficiary's

18

account when adjusting his [or] her award to correct an administrative error." M21-1MR, pt. III, subpt. v, ch. 1, § I (3)(j), http://www.benefits.va.gov/WARMS/M21_1MR3.asp (follow Subpart V, Chapter 1, "Section I - Correcting Erroneous Payments to a Beneficiary Overview" hyperlink; then scroll to Topic 3, paragraph j) (Topic 3 last revised July 10, 2015) (last visited July 13, 2015). This language is consistent with reading "overpayment" in § 3.660(a)(3) as not including payments of excess benefits where administrative error caused such payments.

The regulatory history of § 3.500(b) and § 3.660 is not contrary to the above reading of the relevant provisions. The history discussed below shows how the language regarding "overpayments" came to appear in § 3.660(a)(3). In 1961, *prior* to the amendment to statutory section 3012 that added subsections (b)(4), (9), and (10), VA regulation § 3.660 provided, in pertinent part, that "[w]here receipt of additional income requires the reduction or discontinuance of an award of pension or dependency and indemnity compensation[,] the date of adjustment or discontinuance," if timely reported pursuant to § 3.253,[12] "will be effective the day following the date of last payment" and discontinuance "will be effective as of the date of last payment." 38 C.F.R. § 3.660(a)(1) (found in 26 Fed. Reg. at 1600 (1961)). If not timely reported, the "reduction or discontinuation will be retroactive to January 1 of the calendar year in which the excess income was received, or the commencing date of the award, whichever is later." 38 C.F.R. § 3.660(a)(2) (found in 26 Fed. Reg. at 1600).

Effective January 23, 1962, (and still *prior* to the passage of statutory subsections 5112(b)(9) and (10)), regulatory § 3.660 was revised, and the paragraph pertaining to pension specifically provided:

> If, after approval of an award or the submission of an annual income (and net worth where applicable) questionnaire, the payee begins to receive additional income at a rate which if continued will cause his income to exceed the income limitation applicable to the rate of pension being paid . . . he must notify the VA of such fact. The award to the payee will be adjusted as of the last day of the month (1962 and thereafter) in which such additional income was received . . . . *Any overpayment created under this paragraph will be subject to recovery if not waived.*

_____

[12] VA regulation § 3.253 was subsequently revoked and language was relocated to § 3.660, effective January 23, 1962, discussed below. *See* VA Transmittal Sheet 230 (Jan. 23, 1962).

19

VA Transmittal Sheet 232 at 179-R (§ 3.660(A)(3) (emphasis added)); 27 Fed. Reg. 655 (Jan. 23, 1962). The comments explaining the changes stated that the revision

> [e]stablishes a new and uniform rule concerning the adjustment of awards because of a material change in income, net worth, marital status or status of dependents. The new concept bases adjudication on "facts found" rather than "prompt notice." It eliminates the penalty for failure to report such changes promptly. The new paragraph requires reduction or discontinuance of benefits as of the end of the month in which the change occurs.

VA Transmittal Sheet 231, at 1 (Jan. 23, 1962).

Effective December 1, 1962, VA regulatory § 3.500 was revised to implement statutory subsections 3012(b)(9) and (10) (section 3012 later became section 5112) by adding subparagraphs (1) and (2) to § 3.500(b). VA Regulations Compensation and Pension Transmittal Sheet 271 (Dec. 1, 1962). The two new subparagraphs read the same as the current version of § 3.500(b). Explanatory comments as to the change in § 3.500 noted that subparagraph (b)(1) "is applicable to an act or failure to act on the part of the claimant, or with his knowledge, not necessarily fraudulent in nature, which constitutes misrepresentation or failure to furnish correct or pertinent information." *Id*. at iii. The comments further clarified that subparagraph (b)(2) "relates to awards which were erroneous because of circumstances for which the payee was not responsible" and that the terms "'administrative error' and 'error in judgment' include all administrative decisions of entitlement, whether based on a mistake of fact, misunderstanding of controlling regulations or instructions, or misapplication of law, except as to reduction or discontinuance of compensation because of change in service-connected or employability status or physical condition." *Id*. at iv. The comments further provided: "This subparagraph is applicable in all instances where an erroneous award is reduced or terminated unless the error was due to the payee's failure to furnish correct or complete information. No overpayment will be created." *Id*. This last comment supports the position that subparagraph (b)(2) is for consideration so long as the payee did not fail to furnish correct or complete information; if the payee did not furnish or with his knowledge failed to furnish correct or complete information then subparagraph (b)(1) applies. *Id*. at iii-iv.[13]

---

[13] VA regulation § 3.660 went through numerous additional revisions over the years, including a revision that set apart "overpayments" as a separate subparagraph, effective March 2, 1965, at which time the subparagraph read the same as it currently reads. 30 Fed. Reg. 3354 (1965); VA Transmittal Sheet 345.

*3. Interpretation Offered in Secretary's Brief*

The Court rejects the Secretary's interpretation of section 5112, first announced in the Secretary's brief before the Court, that VA error under section 5112(b)(10) is not for consideration when there has been a change in income. The Secretary's current interpretation is not due deference. First, as discussed above, the language of § 3.500(b)(2) is unambiguous as to its application in circumstances involving a change in the beneficiary's annual income. Given the ambiguous use of the term "award" in section 5112, and the legislative history that clarifies its meaning, it was reasonable for VA to state in regulation § 3.500(b)(2) that its provision implementing section 5112(b)(10) applies to all paragraphs except (r) (and, therefore, includes paragraph (c) pertaining to a beneficiary's annual income). "Deference to an agency's interpretation of its own regulation 'is warranted only when the language of the regulation is ambiguous.'" *Johnson*, 762 F.3d at 1364 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)); *see Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). "An agency's interpretation of its own regulation is controlling unless that interpretation is plainly erroneous or inconsistent with the regulation." *Thun v. Shinseki*, 572 F.3d 1366, 1369 (Fed. Cir. 2009); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997). The Secretary's current interpretation offered as part of this litigation is inconsistent with § 3.500(b)(2) as properly construed based on its plain language. *See Alpough*, 490 F.3d at 1357-58; *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) (holding in the *Chevron* context that "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate"); *Cathedral Candle Co. v. Int'l Trade Comm'n*, 400 F.3d 1352, 1364 (Fed. Cir. 2005) (suggesting that agency litigating positions are entitled to deference in some circumstances); *Mulder v. Gibson*, 27 Vet.App. 10, 16 (2014) ("It is well established that courts should defer to an agency's interpretation of its own ambiguous regulation so long as that interpretation is not inconsistent with the language of the regulation or otherwise plainly erroneous and represents the agency's considered view on the matter.").

Second, the Secretary's current suggested interpretation is inconsistent with the Agency's prior pronouncements interpreting statutory subsections 5112(b)(9) and (10) and current practice. The VA manual provisions, in both current and prior versions, recognized that regulatory § 3.500(b)(1) and (2) are for consideration when VA has made excessive or erroneous payments.

The current relevant VA manual provision, entitled "Handling Cases Involving Administrative Errors," contains instructions including (1) consideration of the cause of the erroneous benefits, and (2) information regarding the payment of erroneous benefits due to (a) claims-processing delays, or (b) systems malfunctions or programming errors. M21-1MR, pt. III, subpt. v, ch. 1, § I.3(a)-(f). The manual instructs that if "the payment of erroneous benefits" is due to an action the beneficiary took or failed to take or to "an action the beneficiary should have known to take or not to take or if the payee knew or should have known that the payment was in error (payee knowledge)," then VA is to adjust the beneficiary's award under § 3.500(b)(1) and that if the payment of erroneous benefits is due to an administrative error on the part of VA, then VA is to adjust the award under § 3.500(b)(2). *Id*. at § I.3(c); *see id.* at § I.3(d), (e) (describing examples of administrative error under § 3.500(b)(2) and directing that the "erroneous payment" be treated as such). Similarly, the prior version of the manual provisions stated that the effective date for reduction or discontinuance of "excessive payments not based on an award action" that were made through VA error are set pursuant to § 3.500(b)(2). M21-1MR, pt. III, subpt. v, ch.1, § I (36)(b) ("Special Adjustment Procedures for Administrative Error") (Aug. 9, 2012).

The VA manual's references to the "payment of excessive benefits" and its citation of § 3.500(b)(2) support the view that it is VA's policy that running awards consisting of recurring monthly payments made as a result of VA administrative error do not create overpayments or valid debts and that VA administrative error must be considered even where the initial award or entitlement to benefits itself was not the result of administrative error.

Accordingly, the Court rejects the Secretary's first argument that administrative error is assessed only when pension is initially awarded. Section 5112 requires administrative error to be assessed not only as to errors in an initial award of benefits but also as to errors affecting a running award that consists of recurring payments. VA administrative error must be considered, when raised, in determining the validity of the debt even where there was no error in the initial grant or award of benefits and where excess payments are made after a change in the veteran's income. To determine the validity of the debt here, we next discuss subsections 5112(b)(9) and (10) in the context of this case involving an increase in the veteran's income.

C. Validity of the Debt

22

An error resulting in an overpayment will not be classified as a VA administrative error or error in judgment if the error is "based on an act of commission or omission by the beneficiary, or with the beneficiary's knowledge." 38 U.S.C. § 5112(b)(9); *see* 38 C.F.R. § 3.500(b)(1); VA Gen. Coun. Prec. 2-90 (Mar. 20, 1990) [hereinafter G.C. Prec. 2-90]. "Knowledge" is "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." BLACK'S at 950. A person may have actual or constructive knowledge of a fact, the latter of which is defined as "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Id*.; *see Bell v. Derwinski*, 2 Vet.App. 611, 613 (1992) (holding that the Secretary, at a minimum, has constructive knowledge of documents generated by VA).

If fault for an overpayment cannot "clearly be ascribed to the beneficiary," VA's policy is to assume that fault and not create a debt against the beneficiary. G.C. Prec. 2-90 (describing VA's "liberal policy" that, "whenever the evidence of record [is] equally susceptible of being interpreted as showing a lack of knowledge by the beneficiary and as showing that he or she knew but failed to disclose material facts to [] VA, the doubt [will] be resolved in the beneficiary's favor"). However, the debt-validity inquiry should not be expanded "out of perceived equitable considerations" because "the law, through a distinct set of provisions, provides an equitable mechanism for mitigating unduly harsh results" via waiver of recovery of the overpayment. *Id*.; *see* 38 U.S.C. § 5302 ("There shall be no recovery of payments or overpayments (or any interest thereon) of any benefits under any of the laws administered by the Secretary whenever the Secretary determines that recovery would be against equity and good conscience . . . ."); 38 C.F.R. § 1.962 (VA's implementing regulation).

The Board's factual findings are entitled to the deference afforded under the "clearly erroneous" standard of review. *See* 38 U.S.C. § 7261(a)(4). On the other hand, "the question whether the [Board] erred in determining the validity of the creation of debt is a question of law, which this Court reviews de novo." *Jordan v. Brown*, 10 Vet.App. 171, 174 (1997).

As with any finding on a material issue of fact and law presented on the record, the Board must support its determination that an overpayment debt was validly created, and the amount of such validly created debt, with an adequate statement of reasons or bases that enables the claimant to understand the precise basis for that determination and facilitates review in this Court. 38 U.S.C.

§ 7104(d)(1); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of evidence, account for evidence it finds persuasive or unpersuasive, and provide reasons for its rejection of any material evidence favorable to the claimant. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

With respect to the validity of the debt in this case, the Board applied 38 U.S.C. § 5112(b)(9) and (10) and 38 C.F.R. § 3.500(b) and determined that the debt was valid based on its finding that (1) VA did not bear sole responsibility for creation of the overpayment, and (2) Mr. Dent had knowledge that his pension amount would change. R. at 5, 8-9. Specifically, the Board found that Mr. Dent had notice in January 2009 "that the amount of his pension benefits would change," and although "he took appropriate action to inform VA, [s]ole administrative error . . . entails no knowledge or fault on the part of the debtor." R. at 9. The Board also found that Mr. Dent's SSA benefits changed significantly as of May 2009, following his receipt of the lump sum payment of $24,484.11 in April 2009, and that "a reasonable person would have entertained significant doubt as to continued entitlement to VA pension benefits after receipt of such an increase of SSA benefits." *Id*. The Board determined that "[t]he elapsed time between VA's receipt of notice in January 2009 and its response in September 2009 does not change the fact the Veteran had knowledge, nor does it mitigate his responsibility." *Id*.

The Court holds that the Board did not err in concluding that VA was not solely responsible for the erroneous payments to Mr. Dent and that thus the creation of an overpayment was valid. The Board found that Mr. Dent had knowledge in January 2009 that "the amount of his pension benefits would change" following an award of SSI, as evinced by his "appropriate action to inform VA" of that award. *Id.* Relying on *Jordan*, *supra*, the Board determined that Mr. Dent's knowledge precluded a finding of sole administrative error because "[s]ole administrative error . . . entails no knowledge or fault on the part of the debtor." *Id*.

In *Jordan*, the Court addressed whether a valid debt was created where the beneficiary informed VA of a change in circumstances but VA did not timely adjust her benefits payments. In that case, a surviving spouse was awarded dependency and indemnity compensation (DIC) and sent

a form explaining: (1) DIC eligibility would terminate upon remarriage,[14] (2) she was responsible for notifying VA of any remarriage, (3) and she must return any DIC payments received after remarriage. *Id*. at 172. More than a decade later, she remarried and notified VA of her name and address change, but VA nevertheless continued to pay her DIC. *Id*. VA ultimately realized its mistake, determined that she had been overpaid DIC, and sought to recover that debt. *Id*. She contested the validity of the debt, but the Board found that the debt was validly created because the creation of the debt was not solely due to VA error. *Id*. at 173-74.

The Court in *Jordan* affirmed the Board decision, holding that the DIC overpayment was not solely the result of VA administrative error because, even though VA was at fault for continuing to pay the appellant's DIC after having constructive notice that a remarriage may have occurred, "such VA error does not excuse the continued acceptance of DIC payments by [the appellant] where she was in receipt of the rules governing such compensation." *Id*. at 174-75. The Court stated: "Professed ignorance of the applicable regulations, and an admission that the . . . relevant materials [included in her initial DIC package] were not read, reveals that the erroneous payment was not 'based solely on administrative error' by VA, and therefore section 5112(b)(1) controls the creation of the debt." *Id*. The Court held that the appellant was responsible for reading the applicable regulations governing DIC compensation, which specified that remarriage would change her entitlement to benefits. *Id*. at 172. Specifically, the information stated that if she remarried, her DIC eligibility would terminate, and that any checks received after she married were to be returned to VA along with a statement showing the date of remarriage. *Id*. The Court stated that the appellant was responsible for "reading the regulations that were included in her initial DIC package" and therefore had knowledge of the applicable regulations. *Id*. at 174-75. The Court noted that, even though the beneficiary took the required affirmative step of notifying VA of her remarriage, she was still partially at fault because she was charged with knowing the rules governing DIC compensation and she cashed the checks that were subsequently sent to her. *Id*. The Court determined that the Board did not err in concluding that the debt was properly created. *Id*. at 175. The Court reasoned that the

---

[14] Prior to January 2004, veterans' surviving spouses receiving DIC became ineligible to continue receiving DIC upon remarriage. *See Sharp v. U.S.*, 580 F.3d 1234, 1236 (Fed. Cir. 2009). However, in the Veterans Benefits Act of 2003, Congress created an exception that restored eligibility to DIC for surviving spouses who remarried after age 57. *See* Pub. L. No. 108-183, § 101, 117 Stat. 2563 (codified at 38 U.S.C. § 103(d)(2)(B)).

appellant's "failure to act in accordance with the rules governing DIC payments constitutes an omission by the payee, [under section 5112(b)(9),] and consequently, her entitlement ceased upon remarriage." *Id.*

In this case, Mr. Dent was notified at the time that he applied for pension that recurring monthly income from any sources "will be counted, unless the law says that they don't need to be counted" and that receipt of monthly benefits is used by VA to "determine the amount of benefits you should be paid." R. at 353. VA included Social Security as a potential source of recurring monthly income that should be disclosed in order for VA to determine the amount of benefits he would be paid. R. at 354. Mr. Dent was also notified when he was awarded non-service-connected pension benefits that a change in income may affect his entitlement and may result in an overpayment that is subject to recovery. Although Mr. Dent was not specifically instructed to return any pension checks should his income increase, that was the logical action to take to avoid an overpayment and he did so. The cover letter enclosing the November 2008 RO decision granting pension benefits notified Mr. Dent that he was awarded the benefit "because [he had] no income from February 12, 2008." R. at 149. The cover letter further stated that it was his responsibility to inform VA right away if his "income or the income of [his] dependents changes (e.g., earnings, Social Security benefits, lottery and gambling winnings)" and if his "net worth increases (e.g., bank accounts, investments, real estate)." R. at 150.

In addition, an enclosed VA Form 21-8768 informed Mr. Dent that his rate of pension was dependent "upon the amount of family income" and that his benefits "may be affected by any changes in the amount of [that] income." Secretary's Br. at A-3 (VA Form 21-8768). VA Form 21-8768 also specifically notified Mr. Dent of his responsibility "to report the total amounts and sources of all income and net worth for you and your dependents for whom you have been awarded benefits," and explained that "[s]ome income is not countable" in determining the rate of pension and that "[b]enefit rates and income limits change frequently; however, you can find out what the current income limitations and rates of benefits are by contacting VA." *Id.* Mr. Dent does not assert that he did not receive a copy of VA Form 21-8768. *See* Reply Br. at 2. Although the enclosed VA Form 21-8768 is not in the record, reference to the form as an attachment to the cover letter from the RO that Mr. Dent received is sufficient indication that Mr. Dent received VA Form 21-8768. *See Butler*

26

*v. Principi*, 244 F.3d 1337, 1339 (Fed. Cir. 2001) (holding that presumption of regularity justified Court's conclusion that a document referenced in a packet sent to the veteran was included in the packet even though the document was not in the veteran's claims file).

Upon receiving the Social Security benefits in December 2008, Mr. Dent's income changed, and he notified VA in January 2009 by letter. His letter stated:

> I was instructed by the local VA office to send you this. As I understand it[,] I am only to receive the difference between the VA disability and my SSDI. (I do not know how much of my SS[A] check is SSI and how much is SSDI.)

> I believe though that I am only to receive from you [$]985 - [$]927 = $58.00 from your office. Please correct me if I am wrong. (I did not cash the check you sent me for Jan[uary] because I also received an SS[A] check.) I am writing VOID on the check I am returning.

R. at 136-37. VA did not respond to that letter until September 2009, and in the mean time Mr. Dent proceeded to receive and cash VA pension checks at the full, unadjusted rate. *See* R. at 16, 77-78.

On this record, the Court cannot say that the erroneous payments to Mr. Dent were the result solely of VA administrative error, pursuant to section 5112(b)(10). The law sets a maximum annual pension rate and that rate is reduced by a veteran's annual income. *See* 38 U.S.C. § 1521(b); 38 C.F.R. §§ 3.3 (2015), 3.23(a) (providing that increases in the rates "will be published in the 'Notices' section of the Federal Register"), 3.27(a) (2015) (regarding cost-of-living increases). VA regulations specifically provide that the maximum rate of improved pension is reduced by the amount of the countable annual income of the veteran. 38 C.F.R. § 3.23(b). In November 2008, VA notified Mr. Dent that he was awarded the maximum pension rate based on his having no income. R. at 149. Given the law and regulations, the pension application form that Mr. Dent completed, the RO's instructions in the November 2008 letter, the VA Form 21-8768, and the information Mr. Dent received from either "the local VA office " (R. at 136) or from the VFW (R. at 14-15) just prior to mailing the January 2009 letter to the RO returning his VA check for December 2008, Mr. Dent had knowledge in January 2009 that his pension benefits would change with changes in his income, specifically, that if he had income, he was not entitled to the full monthly VA pension payment. Mr. Dent's January 2009 letter to the RO does not state that he was given conflicting information. Rather, the January 2009 letter enclosed Mr. Dent's VA pension check dated December 31, 2008,

which he voided, and explained why he was returning the VA check– that he was told to do so and "underst[oo]d " that he was "only to receive the difference between the VA disability and [his] SSDI," that is "$58.00 from [VA]." R. at 136-37.[15]  Accordingly, a valid debt was created based on Mr. Dent's cashing the VA pension check sent to him in the month following January 2009 and with his cashing of each additional check thereafter.

Similar to the appellant in *Jordan*, Mr. Dent continued to accept the pension payments even though he had knowledge that his change in income affected his monthly pension payment.  By accepting the full monthly pension payments, Mr. Dent failed to act in accordance with the rules governing pension payments.  Accordingly, his failure to act in accordance with the rules governing pension payments constitutes an omission by the payee, and consequently his full entitlement ceased upon receipt of the Social Security payment in December 2008.  38 U.S.C. § 5112(b)(4)(A), (9); 38 C.F.R. §§ 3.500(b)(1), (c), 3.660; *see Jordan*, 10 Vet.App. at 175.

The Court acknowledges that VA continued sending monthly payments after Mr. Dent notified VA that his income had increased and that there was administrative delay in responding to the January 2009 letter, but the release of the payments and VA delay in administratively processing the adjustment to the rate of pension is not considered administrative error.  *See* M21-1MR, pt. III, subpt. v, ch. 1, § I(3)(f) ("The payment of benefits in an amount exceeding a beneficiary's entitlement that is due to claims-processing delays is *not* considered administrative error.").  Even if the Court were to consider VA's release of the checks and delay to be administrative error, the erroneous payments were not based *solely* on such release and delay.  Mr. Dent cashed the checks at the full pension rate despite his knowledge that he was not entitled to the full pension amount on each check. He was, therefore, at a minimum, partially at fault.  The Board did not err in finding that "[t]he elapsed time between VA's receipt of notice in January 2009 and its response in September 2009

---

[15] Our dissenting colleague would hold that Mr. Dent did not have knowledge that the pension payment that he returned in January 2009 and the subsequent pension payments for February 2009, March 2009, and April 2009 were erroneous payments because he notified VA of his income change, was not specifically notified that "an overpayment would result from continuing to accept pension checks " after he notified VA of his income change, and "was not told to return his pension checks to VA or to refrain from cashing those checks." *Post* at 35-36.  Significantly, however, because Mr. Dent was instructed that a change in income would affect the amount of his pension benefits, and because he knew he was  receiving the maximum pension rate based on no income, he had knowledge that he was not entitled to keep the full pension amount reflected in his checks.  His January 2009 letter and return of the check reflected this knowledge.

does not change the fact the [v]eteran had knowledge, nor does it mitigate his responsibility." R. at 9. Therefore, the debt was valid and an overpayment was created.[16]

Similarly, the debt was valid from January 2009 until December 2009 because Mr. Dent accepted pension payments during this period despite having demonstrated knowledge that these payments were issued in error. In this regard, the Board found Mr. Dent at fault for the creation of the entire debt because he did not notify VA of the change in his income that resulted from the lump-sum payment of retroactive SSDI in April 2009. R. at 9. The Board also found that Mr. Dent had knowledge that his income exceeded VA pension limits in June 2009 because "a reasonable person would have entertained significant doubt as to continued entitlement to VA pension benefits after receipt of such an increase of SSA benefits." *Id*. Mr. Dent does not dispute that he failed to take action to notify VA of that payment. Accordingly, the Court holds that the Board's finding that VA does not bear sole responsibility for the erroneous payments is supported by an adequate statement of reasons or bases and the Board did not err in concluding that the debt was properly created.

Although Mr. Dent's January 2009 letter asked VA to confirm what amount of pension benefits he was allowed to retain and VA delayed in responding to his inquiry, Mr. Dent confirmed that he did not receive the December 2008 VA check back from VA subsequent to January 2009 and "assumed" that VA's continued delivery of the other checks meant that despite his receipt of the Social Security benefits he was entitled to receive the full amount of the VA check. R. at 16, 19. Although Mr. Dent stated that during his testimony before the Board in August 2011, he was

_____

[16] Our dissenting colleague is similarly troubled by the Agency's processing delay and notes the Board's concession that "VA failed to respond reasonably promptly." *Post* at 37-38. Our colleague states that low-income veterans, like Mr. Dent, are forced to pay for VA's delay. *Id*. Rather than treat such delay as an agency "error" as our colleague would, consideration of delay appears more appropriate in the context of VA's adjudication of the issue whether Mr. Dent is entitled to waiver of recovery of the overpayment. *See* 38 C.F.R. § 1.963 (2015) (discussing waiver of indebtedness when recovery "would be against equity and good conscience"). While the Nation's taxpayers through the actions of its legislators certainly intend for every veteran and veteran's family to receive every dollar intended to recognize their selfless service to the Nation, that generosity of spirit does not permit, as our colleague suggests, a veteran who knowingly accepts overpayments from his fellow citizens' tax dollars to keep them, as a matter of law, simply because the bureaucracy is not as efficient as it should be. While the VA pension programs are established to assist veterans, the Secretary also has a fiduciary responsibility to protect both the public fisc and the integrity of the Government programs. *See Rhodan v. West*, 12 Vet.App. 55, 58 (1998) (Holdaway, J., concurring) ("[I]t must be remembered that the Secretary is not merely representing the departmental interests, he is, in a larger sense, representing the taxpayers of this country and defending the public fisc from the payment of unjustified claims . . . . There is a duty to ensure that, insofar as possible, only claims established within the law are paid. The public fisc and the taxpayer must be protected from unjustified claims."). The Court expresses no opinion of the Secretary's use of his equity authority in this circumstance.

confused, his January 2009 letter reflected his knowledge in January 2009 and provides a sufficient basis for the Board's finding of knowledge on his part. *See Caluza*, 7 Vet.App. at 506.

In light of the foregoing, the Court concludes that the Board did not err in its determination that Mr. Dent played a role in accepting the payments of non-service-connected pension benefits exceeding his entitlement, that the resulting debt was not solely due to VA administrative error, and that the debt was therefore properly created. The resulting overpayment is, therefore, subject to recovery. The matter is remanded for the Board to assign an appropriate effective date for the reduction and discontinuance of Mr. Dent's pension award in accordance with section 5112 and § 3.500. Specifically, as directed in § 3.500, the effective date "will be the earliest of the dates stated in these paragraphs unless otherwise provided." As discussed above, both § 3.500(b)(1) and § 3.660 are applicable here, and the Board did not discuss § 3.660 or section 5112(A)(4).

## D. Amount of the Debt

Mr. Dent next argues that the Board clearly erred in not addressing the amount of the overpayment debt and that the Court, by virtue of his appeal of the related issue of the validity of the debt, should "decide [that] question of law despite the Board's failure to do the same." Appellant's Br. at 10. He argues that the amount of the debt claimed by VA as owed is invalid because it does not correspond to the amount of payments he received. *Id*. at 10-11. The Secretary disputes the contentions, argues that the amount of the debt was not challenged before the RO or the Board, and asserts that the Court lacks jurisdiction to decide that issue in the first instance. Secretary's Br. at 21-24. The veteran responds that his February 2010 Notice of Disagreement (NOD) expressly challenged the amount of the debt and that VA failed to act on that issue. Reply Br. at 3-4. Although he maintains that the Court has jurisdiction to address the amount of the debt in the first instance, he argues in the alternative that, if further factfinding is required, the Court should remand that issue to the Board for such factfinding and adjudication. *Id*. at 4.

The Court agrees with the veteran that the February 2010 NOD encompassed the issue of the amount of the debt, but disagrees that at this time the Court initially addressing that issue is the proper course of action to be taken. The RO issued a decision in December 2009 finding that an overpayment existed and calculating the amount of the reduction of the appellant's monthly pension amount effective January 1, 2009, and the discontinuing pension benefits effective May 1, 2009.

30

R. at 82-83. On January 15, 2010, the Debt Management Center notified the appellant that his debt was $11,538. R. at 627 ("[Y]ou were paid $11,538.00 more than you were entitled to receive."). The appellant's February 2010 NOD contained a clear expression of disagreement with the RO's calculation of the debt amount, which was sufficient to initiate an appeal of that issue. R. at 77 ("I feel I should only have to pay back the money paid to me after the letter I received in September [2009]."); *see Jarvis v. West*, 12 Vet.App. 559, 562 (1999) (reviewing the language and context of an NOD to determine its scope); *see also* 38 C.F.R. § 20.201 (2015) (requiring that an NOD be written "in terms which can be reasonably construed as disagreement with [an adverse AOJ] determination and a desire for appellate review"). Yet, the RO failed to recognize his disagreement as to the amount of the debt and issued an SOC in September 2010 that only addressed the validity of the debt. R. at 47-69; *see* 38 C.F.R. § 1.911(c) (explaining that a debtor "has the right to informally dispute the existence or amount of the debt, to request waiver of collection of the debt, to a hearing on the waiver request, and to appeal the [VA] decision underlying the debt," all of which "can be exercised separately or simultaneously"). The RO's failure to issue an SOC as to the disputed amount of the debt means that that issue was not finally decided by the RO and is still pending below. *See* 38 U.S.C. § 7105(d)(1) (stating that, after the AOJ receives a timely NOD, it "will take such development or review action as it deems proper" and, "[i]f such action does not resolve the disagreement," it "shall prepare a[n SOC]"); *Tablazon v. Brown*, 8 Vet.App. 359, 361 (1995) (holding that the RO's failure to issue an SOC prevented the disputed RO decision from becoming final and appealable to the Board and the claim therefore remained pending). Accordingly, the Board erred in failing to recognize the status of the issue when it simply stated that "the claims file does not specify the exact amount of the overpayment calculated by the RO." R. at 4.

Contrary to the veteran's contentions, the proper remedy in such a situation is not for the Court to decide this fact-specific issue in the first instance or to remand it to the Board for initial adjudication. *See* Appellant's Br. at 10-11; Reply Br. at 3-4. Rather, the appropriate course of action is to remand that issue to the Board with instructions to further remand it to the RO for issuance of an SOC that includes the exact amount of the debt and an explanation as to how it was calculated. *See Fenderson v. West*, 12 Vet.App. 119, 132 (1999) (holding that the Board's finding that a matter was not before it because a Substantive Appeal had not been filed was error and determining that,

31

because a timely NOD had been submitted and the RO never responded by issuing an SOC as required by law and regulation, the proper remedy was to vacate the Board decision as to the matter and remand to the Board "for appropriate procedural compliance, specifically the issuance of an SOC"); *see also Manlicon v. West*, 12 Vet.App. 238, 240-41 (1999) (holding that, because the appellant had filed an NOD, "the Board should have remanded that issue to the RO, not referred it there, for issuance of [an] SOC"). Accordingly, the debt continues to be in litigation until the amount of the debt is finally determined. *See* 38 C.F.R. § 1.910(b)(1) (2015).

On remand, Mr. Dent is free to present any additional arguments and evidence in accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order). *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). The Court reminds the Board that "[a] remand is meant to entail a critical examination of the justification for [the Board's] decision," *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and must be performed in an expeditious manner in accordance with 38 U.S.C. § 7112.

### III. CONCLUSION

Upon consideration of the foregoing, the portion of the April 30, 2013, Board decision finding that the overpayment debt against Mr. Dent was validly created is AFFIRMED. The pending issue of the proper debt amount, in addition to the assignment of an appropriate effective date for the reduction and discontinuance of the pension award, is REMANDED to the Board with the instruction to further remand it to the RO for issuance of an SOC.

BARTLEY, *Judge*, concurring in part and dissenting in part: I dissent from part II.C of the decision because no debt was validly created between January 2009 and April 2009. During that period Mr. Dent fulfilled all legal requirements by notifying VA of his income change. Given VA's failure to promptly reduce his pension payment after such notification, or to communicate that he should return subsequently received checks, he had no knowledge that continued receipt of pension at an unadjusted rate was wrong. Consequently, VA's continued payments at the same rate between January 2009 and April 2009, after VA received notice of Mr. Dent's changed income, is

administrative error solely due to VA inaction in processing the veteran's income information and in failing to communicate with him.

Pursuant to 38 U.S.C. § 5112(b)(9) and (10), a debt is created when an "erroneous award" of benefits is "based on an act of commission or omission by the beneficiary, or with the beneficiary's knowledge." *See* 38 C.F.R. § 3.500(b). A debt is not created when such award is "based solely on administrative error or error in judgment." *Id.*; G.C. Prec. 2-90. As to whether there was "an act of commission or omission by the beneficiary," the law requires that an individual who has applied for or receives pension "promptly *notify* the Secretary whenever there is a material change in the annual income of such applicant or recipient." 38 U.S.C. § 1506(3) (emphasis added); *see* 38 C.F.R. § 3.277(b)(1) (2015) (requiring that pension applicants and recipients "*notify* the Secretary of any change affecting entitlement," including changes in income (emphasis added)). Mr. Dent took the precise action legally required of him by statute and VA regulation, promptly notifying VA in January 2009 of his changed income. There is no legal requirement other than notification placed on pension recipients when their income changes. *See generally* VETERANS' BENEFITS: IMPROVED MANAGEMENT WOULD ENHANCE VA'S PENSION PROGRAM, GOV'T ACCOUNTABILITY OFFICE 5 (Feb. 2008) [hereinafter 2008 GAO REPORT] (explaining that "[p]ensioners are required to *report* any changes in income, dependency, or other relevant circumstances to VA so that benefit levels can be adjusted accordingly" and that "[p]ensioners are required to *inform* VA of any changes in their circumstances . . . that could affect their eligibility or benefit levels" (emphasis added)). At that point, veterans rely on VA to recalculate their pension benefits and inform them of any change in pension rate.

Not only did Mr. Dent comply with the applicable statutes and VA regulations, he complied with each and every instruction he received from VA. When Mr. Dent applied for pension, he was instructed to "give [VA] a copy" of any monthly benefit award letter to "help [VA] determine the amount of benefits [he] should be paid." R. at 353. Then, when initially awarded pension, the RO informed him that (1) his pension rate *"may be affected* by any changes in the amount of [that] income," VA Form 21-8768 (emphasis added); and (2) he was "responsible to *tell* [VA] right away if [his] income or the income of [his] dependents change[d]," including via receipt of SSA benefits (R. at 150; *see also* VA Form 21-8768 ("You are required to *report* the total amounts and sources

33

of all income. . . . *Notify* us immediately if there is a change in any condition affecting your right to continued payments.")). He was also informed that "*[f]ailure to notify* [VA] of [income] changes immediately will result in an overpayment which is subject to recovery" (VA Form 21-8768) (emphasis added).

As the Board found, Mr. Dent promptly took appropriate action in January 2009 to notify VA of the December 2008 award of SSA benefits as required. R. at 9; *see* R. at 117-37. Per statute (38 U.S.C. § 1506(3)), VA regulation (38 C.F.R. § 3.277(b)(1)), and VA instructions (R. at 148-52, 353; VA Form 21-8768) and contrary to the Board's (R. at 9) and the majority's conclusions (*ante* at 28), no further action was required of him in January 2009. Because he fully complied with the applicable statutes, VA regulations, and instructions relevant to changes in income for VA pension beneficiaries, it cannot be said that the erroneous award of pension benefits was even in part based on an act of commission or omission by Mr. Dent. *See* 38 U.S.C. § 5112(b)(9); 38 C.F.R. § 3.500(b)(1).

As to whether Mr. Dent had "knowledge" that his VA pension payments between January 2009 and April 2009 were erroneous, the Board (R. at 9) and the majority, *ante* at 27, found that he had knowledge in January 2009 that, even after he had notified VA of his changed income, his continued receipt of pension benefits at an unadjusted rate would result in an overpayment that would ultimately be subject to recovery. But, as explained above, Mr. Dent was informed only that failure to *notify* VA of an income change would result in a recoverable overpayment. VA Form 21-8768 ("Failure to notify [VA] of [income] changes immediately will result in an overpayment which is subject to recovery."). At no point was he expressly or impliedly informed that an overpayment would result from continuing to accept pension checks after having fulfilled the notification requirement. Nor was he expressly or impliedly informed that he should take any action other than or in addition to informing VA of the income change. He was not told to return his pension checks to VA or to refrain from cashing those checks.[17]

---

[17]The fact that Mr. Dent was initially awarded the maximum amount of pension does not confer knowledge that a subsequent income change would necessarily result in a lower pension rate. At most, that fact indicates that Mr. Dent knew that he would not be entitled to receive a higher pension rate and that he should disclose any income change to VA for it to determine whether an adjustment was warranted. Again, this is precisely what Mr. Dent did in this case.

Although the majority draws parallels between Mr. Dent and the beneficiary in *Jordan v. Brown*, Ms. Jordan was "plainly instructed" that remarriage would "terminate" her benefit entitlement and that any checks received subsequent to a remarriage were to be "returned" to VA. *See Jordan v. Brown,* 10 Vet.App. 171, 174-75 (1997). The Court in *Jordan* therefore reasoned that her "[p]rofessed ignorance of the applicable regulations" and "admission that the included and relevant materials were not read" foreclosed a finding of sole VA administrative error because knowledge of those rules could be imputed to her. *Id.* However, unlike Ms. Jordan, Mr. Dent was not instructed at the time that he was awarded VA benefits, or at any other time, that he should return or refrain from cashing pension checks received after he notified VA, or that a change in income would necessarily reduce his pension benefits. Nor was he informed that there would be a detrimental consequence for continuing to cash pension checks that VA erroneously sent to him after he took the legally required steps to notify the Agency of his income change. R. at 148-52; VA Form 21-8768. Thus, knowledge that a debt would be created if he cashed subsequent checks after timely notifying VA of an income change–a consequence not delineated in applicable statutes and regulations or in any communication sent to Mr. Dent–cannot be imputed to him.

The lack of plain instructions to Mr. Dent contrasts sharply with the clear instructions provided to Ms. Jordan. Ms. Jordan's case illustrates that VA is able to inform veterans and beneficiaries when action beyond disclosure of a change is necessary. *See Jordan*, 10 Vet.App. at 174. VA's lack of clear guidance in this case resulted in Mr. Dent's confusion about the effect of the December 2008 SSA award on his VA pension benefits. This confusion is evinced by his January 2009 letter asking VA to confirm his pension rate (R. at 136), his repeated efforts to attempt to clarify that matter (R. at 14-16, 43-44, 77-78, 626), and the conflicting responses he received (*id.*).[18] Such confusion does not meet the definition of "knowledge" in that it does not reflect "[a]n awareness or understanding of a fact or circumstance" or "a state of mind in which a person has no substantial doubt about the existence of a fact." *Ante* at 23 (citing BLACK'S LAW DICTIONARY 950

---

[18]Such confusion is surely reasonable given VA's complex rules regarding how to calculate countable income for VA pension purposes. *See* 38 C.F.R. §§ 3.271-272. For example, although recurring benefit payments are generally counted as income, *see* 38 C.F.R. § 3.271(a)(1), some recurring SSA payments are excluded, *see* 38 C.F.R. § 3.272(a); M21-1MR, pt. V, subpt. iii, ch. 1, § B(1)(k). VA regulations outline at least 23 types of proceeds or expenses that may be excluded or deducted, respectively, from countable income. *See* 38 C.F.R. § 3.272(b)-(x).

(9th ed. 2009). To the contrary, Mr. Dent's actions, testimony, and letters all reflect substantial doubt as to his appropriate pension rate after the December 2008 SSA award.

In such a situation, VA's "liberal policy" of assuming all fault for erroneous payments that cannot "clearly be ascribed to the beneficiary" must control. G.C. Prec. 2-90 ("Whenever the evidence of record [is] equally susceptible of being interpreted as showing a lack of knowledge by the beneficiary and as showing that he or she knew but failed to disclose material facts to [] VA, the doubt [will] be resolved in the beneficiary's favor."). Thus, the Board erred in finding that Mr. Dent had knowledge that he was receiving erroneous award payments between January 2009 and April 2009, and that a debt was properly created during that period. To the contrary, those erroneous payments were made without Mr. Dent's knowledge. *See* 38 U.S.C. § 5112(b)(9); 38 C.F.R. § 3.500(b)(1).

The majority's citation to a self-serving internal VA rule, that processing delays and continued payment of benefits following a veteran's notification of income change is not administrative error, is troubling. *Ante* at 28; *see Harvey v. Shinseki*, 24 Vet.App. 284, 290 (2011) (characterizing a four-month processing delay as administrative error); M21-1MR, pt. III, subpt v, ch. 1, § I(3)(f) ("The payment of benefits in an amount exceeding a beneficiary's entitlement that is due to claims-processing delays is *not* considered administrative error."). This provision forces low-income veterans such as Mr. Dent to bear the hardship of a debt that must be repaid even though they complied with all VA legal and instructional requirements. In essence, they are forced to pay for VA's failure to communicate consequences to veterans and to promptly respond to veterans' income disclosures. *See* VA OFFICE OF INSPECTOR GENERAL, AUDIT OF PENSION PAYMENTS 4, 11 (Sept. 4, 2013) [hereinafter 2013 PENSION AUDIT] (finding an average 15-month delay in processing changes to running awards of pension, even though 70% of those changes could be "processed immediately upon receipt"); *accord* VA OFFICE OF INSPECTOR GENERAL, REVIEW OF PENSION MANAGEMENT CENTERS 4 (Mar. 30, 2011) (finding that processing of income verification matches were "not adequate or timely").

Contrary to the majority's assertion, I am not insensitive to the Secretary's fiduciary duty to protect the public fisc. *See ante* note 16. Rather, I believe that acknowledging as administrative error delay and failure to communicate with veterans, such as Mr. Dent experienced, ultimately

lowers the cost of pension overpayments to taxpayers and is consistent with the law in that veterans who comply with VA rules and promptly notify VA of income changes would not be adversely affected. VA would have an incentive to promptly adjust running pension awards after being timely notified of income changes, eliminating or at least minimizing the amount of an overpayment. Significantly, between March 2011 and March 2012, VA's failure to timely process income-change notifications from veterans and beneficiaries resulted in at least $94 million of pension overpayments–a portion of which is ultimately irrecoverable, *see* 2008 GAO REPORT at 20 (referencing the burden of recovering overpayments from a low-income population)–plus the attendant costs of debt collection and litigation. *See* 2013 PENSION AUDIT at 3-4. Moreover, VA has *already* made the policy decision to assume the cost of pension overpayments that are not the result of beneficiary fault or made with the beneficiary's knowledge, thereby opting to pass that cost on to taxpayers. *See* G.C. Prec. 2-90.

In sum, the Board conceded that VA failed to respond reasonably promptly to Mr. Dent's January 2009 letter or update his income information, even though he took "appropriate action" to timely notify VA of his December 2008 award of SSA benefits. R. at 9. Given that the erroneous award of pension benefits between January 2009 and April 2009 was not based on an act of commission or omission by Mr. Dent or with his knowledge, any and all fault for the consequent payment of pension benefits at the unadjusted rate during that period must be ascribed to VA, compelling a finding of sole administrative error. The majority's holding to the contrary does not comply with the law, frustrates the purpose of the VA pension program, contravenes VA's liberal policy of assuming fault for erroneous payments in questionable cases, and unjustly imposes retroactive responsibilities on Mr. Dent that were not previously communicated to him. Therefore, I must respectfully dissent from the majority's conclusion that a debt was validly created between January 2009 and April 2009.